1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

10
11
12
13
14
15
16
17

| | | |
|---|---|---|
| FRANK PORCO, | ) | CASE NO. CV 08-01538 MMM (PJWx) |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | FINDING OF FACT AND |
| | ) | CONCLUSIONS OF LAW |
| THE PRUDENTIAL INSURANCE | ) | |
| COMPANY OF AMERICA and | ) | |
| SUPERIOR INDUSTRIES | ) | |
| INTERNATIONAL, INC. LONG TERM | ) | |
| DISABILITY PLAN, | ) | |
| | ) | |
| Defendants. | ) | |

18
19
20
21
22
23
24
25
26
27
28

On March 5, 2008, Frank Porco filed this action against the Prudential Insurance Companies of America ("Prudential") and Superior Industries International, Inc. Long Term Disability Plan (the "Plan"). Porco alleges that he was denied long-term disability benefits to which he was entitled under the Plan, a long-term disability ("LTD") benefit plan established by his employer Superior Industries International, Inc. ("Superior"), and insured by Prudential. Porco seeks retroactive reinstatement of benefits with prejudgment interest and attorneys' fees. After reviewing the administrative record and considering the parties' trial briefs, the court makes the following findings of fact and conclusions of law.

# I.  FINDINGS OF FACT

## A.    The Plan

1.    The Plan is governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq. ("ERISA"), as it is an employee benefit plan funded by plaintiff's employer.[1]

2.    Prudential acted in the capacity of Plan Administrator.[2]

3.    Under the Plan, an employee is considered disabled and entitled to payments when the employee is "unable to perform the material and substantial duties of [his] regular occupation due to [his] sickness or injury," and experiences "a 20% or more loss in [his] indexed monthly earnings due to that sickness or injury."[3]  After 24 months of payments, an employee is considered disabled if "due to the same sickness or injury," he is "unable to perform the duties of any gainful occupation for which [he] is reasonably fitted by education, training or experience."[4]  "Gainful occupation" is defined as "an occupation, including self employment, that is or can be expected to provided [an employee] with an income equal to at least 80% of [his] indexed monthly earnings within 12 months of [his] return to work."[5]

## B.    Porco's Employment, Experience and Educational Background

4.    Porco was employed by Superior as a "Senior Corporate Quality Warranty Engineer" or

---

[1]Administrative Record ("AR") at 581; Complaint, ¶ 4; Answer, ¶ 4.  For convenience, all citations to the administrative record omit the "PRU/PORCO" prefix and refer only to the page number.

[2]Complaint, ¶ 3; Answer, ¶ 3.

[3]AR at 583.

[4]*Id.*  The plan documents submitted do not indicate the number of months of payments after which an employee must establish that he cannot perform "any" occupation; they simply state, "After ___ of payments . . . ."  (*Id.*)  All letters sent to Porco, however, indicate that the time period was 24 months.  (*Id.* at 44, 134, 142.)

[5]*Id.* at 583.

1    "Corporate Warranty, Quality Engineer" from January 21, 1998 through April 10, 2002.[6]

2  5.   According to Superior's job description, the essential functions of Porco's position

3       included receiving, evaluating and documenting "customer warranty returns, assembly

4       plant returns, and customer tested parts," as well as maintaining records regarding such

5       items.[7] Porco asserts, however, that the job involved testing returned automotive parts to

6       determine if they were defective and covered by warranty.  He maintains that the job

7       required the use of "ladder, pallet jack, wheel racks, wheel water testing/balancing" and

8       regular lifting of 35-40 pound wheels.[8]

9  6.   Porco graduated from California State University in 1975 with a B.S. in business

10      administration.[9]  According to the information he gave Prudential, Porce worked as a

11      "service advisor" or "service manager" at "various automobile dealerships" from 1988-

12      1998.[10] There is no information in the record regarding his employment between 1975 and

13      1988.

14      **C.    Initial Neurological Examinations, Surgery, & Approval of Benefits**

15  7.   On February 25, 2002, Porco was seen by Dr. Pablo Lawner for a neurological

16      consultation based on a history of intermittent back pain that was exacerbated by sitting,

17      and that had gradually become more severe.[11]  Lawner conducted an MRI of Porco's

18      lumbar spine,[12] and saw a "fluid filled cavity" that he found "extremely interesting."[13]

19

20      [6]*Id.* at 39-41.

21      [7]*Id.* at 41.

22
23      [8]*Id.* at 184.

24      [9]*Id.* at 185.

25      [10]*Id.* at 184, 205.

26      [11]*Id.* at 16.

27      [12]*Id.*

28      [13]*Id.* at 17.

3

Lawner concluded that Porco's diagnosis was "likely. . . [an] aneurysmal bone cyst," and recommended a three dimensional CT scan of the area.[14]  Following this procedure, on March 25, 2002, Lawner again diagnosed a possible aneurysmal bone cyst.[15]  He recommended a surgical procedure described as "partial decompressive laminectomy," "resection of cyst," and "local bone grafting."[16]  Porco agreed to undergo the surgery, and the procedure was scheduled for April 11, 2002.[17]

8.      Porco ceased work on April 9, 2002.[18]

9.      During the procedure, the surgeons concluded that Porco did not have a cyst.  Rather, the surgeons encountered leaking spinal fluid and "a tangle of [nerve tissue] which corresponded anatomically to the surgical area where the presumed cyst was."[19]  The doctors decided to discontinue the procedure at that point.[20]

10.     At a post-surgical follow-up appointment on April 26, 2002, Lawner noted that the wound from the surgery had healed well, but that Porco was experiencing "symptoms in his buttocks."[21]  He opined that Porco should undergo a "lumbar myelogram in order to determine the details of th[e] pathology" discovered during the surgery, "which appear[ed] to be some sort of meningocele without dural covering, but with bony coverage."[22]

11.     Based on the myelogram, Lawner diagnosed "spinal stenosis from a posterior compression

---

[14]*Id.* at 18.

[15]*Id.* at 11,  21.

[16]*Id.*

[17]*Id.*

[18]*Id.* at 39.

[19]*Id.* at 10, 21.

[20]*Id.*

[21]*Id.* at 10.

[22]*Id.*

at the L2-3 level."[23]   At a further consultation on May 10, 2002, Lawner noted that Porco "continue[d] to have symptoms."[24]   He recommended that Porco seek a second opinion from Dr. Patrick Johnson, as the diagnosis indicated that "a more extensive procedure with probably a significant amount of dual grafting" would be required.[25]

12.   Porco saw Johnson on June 20, 2002.   Porco described his symptoms to Johnson as follows: "constant pain" in his buttocks, occasional "shooting pain up the right leg," pain in the left and right calves, lancinating pain in the lateral right calf, "some degree of pins and needles throughout posterior thighs and calves," and unspecified "symptoms in the anterior ankles."[26]   Porco reported that the pain was not relieved by pain killers and prevented him from walking longer than ten minutes.[27]   Johnson noted that Porco could "do all the normal activities of daily living," though with discomfort.[28]   Porco experienced "difficulty" sitting more than ten minutes at a time; standing was "slightly more comfortable at a thirty-minute duration."[29]   Johnson recommended "not invading the myelomeningocele itself, but rather performing a decompressive surgery pending further evaluation."[30]

13.   On June 21, 2002, Lawner certified that Porco was unable to perform his regular work due to a "bone cyst" in the lumbar spine resulting in "back pain."[31]

---

[23]*Id.* at 27.

[24]*Id.*

[25]*Id.*

[26]*Id.* at 29.

[27]*Id.*

[28]*Id.*

[29]*Id.* at 30.

[30]*Id.* at 31.

[31]*Id.* at 7.

14.   On July 19, 2002, Prudential notified Porco by letter that it had approved his claim for LTD benefits under the Plan, effective July 10.[32]

**D.   Further Medical Evaluation and Finding of Total Disability**

15.   On September 26, 2002, Porco's primary care physician, Dr. David Aframian, wrote Prudential.  He stated that Porco had been "suffering chronic low back pain" for the past year, and was taking vicodin, naprosyn, and robaxin for the pain.[33]  Aframian advised that Porco's "restrictions" were no lifting over five pounds, and no bending, climbing, pushing or pulling.[34]

16.   In October 2002, Porco began to receive Social Security disability benefits.[35]

17.   On December 10, 2002, Porco consulted Dr. Susan Yadegar for a third opinion.[36] Yadegar noted that Porco reported his back pain was "worse" and that he was experiencing "shooting pain down the legs."[37]  Yadegar diagnosed Porco with "tethered cord syndrome."  She noted that this diagnosis was "completely different" than the Lawner's and Johnson's diagnoses; nonetheless, she was "somewhat confident" about the diagnosis, and proposed a "wide-open laminectomy."[38]  She recommended that Porco be seen by her "mentor," Dr. Gordon McComb.[39]

18.   Porco apparently did not pursue Yadegar's suggestion that he see McComb.  Instead, he

---

[32]*Id.* at 44.

[33]*Id.* at 94.

[34]*Id.*

[35]*Id.* at 98-99.

[36]*Id.* at 95.

[37]*Id.*

[38]*Id.* at 96-97.

[39]*Id.* at 97.

began treatment with a chiropractor, Dr. Wayne Press.[40]

19.   On April 29, 2003, Prudential reviewed Porco's file.   The claim manager noted that Porco's "job duties are medium in nature[.] Although medical information in file is limited[,] it is reasonable that he would be impaired from his medium duty occ[upation]." The claim manager suggested further inquiry regarding Porco's "functional status" and medications; whether additional surgery was planned; whether Porco was still limited to lifting five pounds; and whether he was interested in transferring to a less physical occupation.[41]

20.   On June 26, 2003, Porco advised Prudential he was not receiving medical treatment from any doctor other than his primary care physician, Dr. Arboleda.[42]   On July 7, 2003. Dr. Arboleda told Prudential he had not seen Porco since February.[43]

21.   On July 11, 2003, a Prudential claims manager reviewing Porco's file indicated that "previous medical [records] in file support[ed] impairment from [ ] medium duty occ[upation] due to the presence of the cyst in his spine." The claims manager noted that Porco had not seen a physician in the past six months and questioned whether he was receiving appropriate care.[44]   On August 8, 2003, a claims manager reported that the "medical [records] support[ed] impairment from reg[ular] occ[upation]."[45]

22.   On October 16, 2003, Porco saw Dr. Rafael Quinonez for a neurological consultation. Quinonez discussed the prior doctors' studies with Porco; he noted that new studies would be required "before final recommendations [could be] made." He requested spinal x-rays

---

[40]*Id.* at 103-06, 561.

[41]*Id.* at 116.

[42]*Id.* at 561

[43]*Id.* at 121.

[44]*Id.* at 123.

[45]*Id.* at 128.

and MRI's.[46]  After reviewing these items, Quinonez noted in his records of a January 22, 2004 follow-up consultation that "[t]he study reveals very complex findings at the L2-L3 level."  He stated that "the radiologist called this possible pseudomeningocele,"and that he observed a possible bone cyst, "a cluster of blood vessels . . . suspicious of arteriovenous malformation," and "multiple hemangiomas" at other levels of the spinal column.   Quinonez also noted that Porco reported "severe pain at level 10 most of the time with pain radiating from the mid lumbar area to both hips and to both lower extremities."[47] He recommended either a spinal angiogram or a CT angiogram of the spine to "evaluate the abnormal blood vessels," and decompression and stabilization of the spinal canal at the L2-L3 level.[48]  Overall, Quinonez found that Porco presented a "very complex spinal problem."[49]

23.   On March 24 and 29, 2004, Prudential sent Porco letters indicating that, as of July 9, 2004, he would have to establish, among other things, that he was not able to perform the duties of any job for which he was "reasonably fitted" by "education, training, or experience" in order to continue to qualify for LTD benefits.[50]   The letters included various forms for Porco to fill out and return.[51]   At some point prior to this, Porco had relocated to Burleson, Texas.[52]

24.   On April 1, 2004, Porco consulted Dr. Roger Blair.  Porco reported a wide variety of pain and other symptoms to Blair: "chronic sharp jolts mainly down the right leg"; "a vibrating

---

[46]*Id.* at 210-11.

[47]*Id.*

[48]*Id.*

[49]*Id.*

[50]*Id.* at 134-35, 142-43.

[51]*Id.* at 134-159.

[52]*Id.* at 134, 142.

sensation intermittently across the legs"; inability to bend his ankles; "very deep" pain in [the] legs and stomach"; a "constant" "sensation of someone cutting into his sacrum with a knife and placing iodine on it," which did not respond to vicodin but was occasionally relieved by deep massage; and "severe headaches that wrap around his forehead and behind his eyes" "1 to 3 [times] per week to 1 to 2 [times] per month."[53]  Blair diagnosed back pain and "probable meningomyelocele."[54]  He recommended an MRI of Porco's lumbar spine, and prescribed  neurotonin for Porco's nerve pain.[55]

25.  After the MRI was conducted, Blair observed "evidence of severe central canal stenosis at L2-3," "mild central canal stenosis at L3-4 and L4-5," and "probable hemangioma at L5."[56]  Blair's diagnosis at a follow-up visit on April 21, 2004 was "back pain," "severe lumbar stenosis at L2-3," and "possible meningomyelocele."[57]During this visit, Porco advised that he had stopped taking the neurotonin because he believed it produced headaches.[58]  Blair noted: "At this time I do not think the patient can return to his regular work duties."  He recommended that Porco "get another neurosurgical opinion regarding his severe lumbar stenosis."[59]

26.  Porco returned the forms he received from Prudential in March on May 3, 2004.[60]  They included a form filled out by Blair, indicating that Porco was "unable to work" and would continue to be unable to work "if his condition [was] inoperable."  Blair stated that Porco

---

[53]*Id.* at 160.

[54]*Id.* at 163.

[55]*Id.* at 164.

[56]*Id.* at 168.

[57]*Id.*

[58]*Id.* at 166.

[59]*Id.* at 169.

[60]*Id.* at 172.

was taking vicodin and ibuprofen and using lidocaine patches for back and leg pain.[61]  On forms that he personally completed, Porco stated that it had become difficult to put on his pants and shoes due to pain, and that he sometimes required a cane to walk if he was having particular trouble with his ankles.[62]  He reported significant difficulties sleeping.[63]  He stated that he drove up to ten miles 5-6 times per week, and could sit as a passenger is a car for up to 100 miles depending on the severity of his pain.[64]  Porco indicated that he spent 15 minutes taking out the trash and recycling and less than one hour per week on other household chores, including dusting, laundry, and "light gardening work" within the five pound weight restriction imposed by his doctor.[65]

27.   On May 21, 2004, Prudential sent Porco a request for updated medical records and a work history to complete and return.[66]  On June 8, 2004, Prudential requested updated medical records from Dr. Blair.[67]  The records were faxed to Prudential on July 6, 2004.[68]

28.   On June 28, 2004, Porco was seen by Dr. Andrea Halliday.  Halliday noted that Porco's "chief complaint" was "electrical shocking, stabbing-like pain that radiate[s] bilaterally from his buttocks into the posterior thighs, posterior legs, to his first toe."  Porco rated the pain at level 7-8 of ten.  Halliday noted that Porco did "not have much back pain per se," and that "sitting, standing, lying[,] . . . walking, and bending tend to aggravate his symptoms."  She stated that he "denie[d] bowel and bladder incontinence, however, he

---

[61]*Id.* at 174.

[62]*Id.* at 182.

[63]*Id.* at 183.

[64]*Id.* 187-88.

[65]*Id.* at 190.

[66]*Id.* at 200.

[67]*Id.* at 216.

[68]*Id.* at 230.

does have some dribbling."  She noted that Porco was taking ibuprofen and vicodin, and using Licoderm patches.  Halliday examined Porco's April 2004 MRI and noted stenosis, possible meningocele, and clumping of nerve roots at the L2-3 level, as well as stenosis at the L3-4 level.  She recommended a myelogram and CT scan to facilitate further analysis, and noted that Porco was "likely to require surgical intervention" at the L2-3 level, possibly including "duraplasty and closure of the meningocele."[69]  Prudential was informed of the results of Halliday's consultation.[70]

29.   On July 7, 2004, Prudential sent Porco a letter indicating that it had completed a review of his claim and determined that he was totally disabled.[71]  The letter stated that Porco would continue to receive benefits, and noted that Prudential would contact Porco and his physician for updated medical information "[p]eriodically."[72]

**E.    Prudential's Surveillance of Porco and Termination of Benefits**

30.   On July 21 through 23, 2005, the Merrill Group, a private investigation firm, conducted video surveillance of Porco at Prudential's request.[73]  Prudential apparently decided to conduct the surveillance after being contacted by an "anonymous informant."

31.   The surveillance footage opens with several uneventful shots of houses, a small lake, and dirt roads in rural Texas.  Eventually, it shows an individual whom the parties agree is Porco briefly walking across a small dusty area of yard between a house and a mobile home.  Porco appears to move easily and walks with a loping gait that might possibly be associated with being under the influence of strong painkillers.

32.   Defendants focus in particular on two scenes from the surveillance footage.  The first,

---

[69]*Id.* at 242.

[70]*Id.* at 245-46.

[71]*Id.* at 247

[72]*Id.*

[73]*Id.* at 255-65.

approximately five and a half minutes in, shows Porco carrying what appears to be a floppy white pipe, approximately fifteen feet long, over his right shoulder for approximately forty-five seconds before handing it to another individual who is partly visible behind a tree.  The pipe appears to be made of lightweight plastic, and, although the court cannot determine its precise weight, its pronounced floppiness indicates that it is not particularly heavy.

33.  The second scene, approximately ten minutes and ten seconds into the footage, shows Porco pulling a small wheel barrow with his right arm for approximately thirty seconds before disappearing behind the house.  The wheel barrow is full but the nature of its contents cannot be determined from the video.  The court cannot determine the weight of the wheel barrow, but Porco appears to pull it with ease.

34.  Following receipt of the surveillance video, on September 1, 2005, Prudential's Dr. Richard Day conducted a clinical review of Porco's file; this encompassed a review of records from Drs. Lawner, Johnson, Aframian, Yadegar, Blair, and Halliday, as well as the surveillance video.  Day reached the following conclusions: (1) Porco suffered from spinal stenosis related to probable meningomyelocele, but his present restrictions of no bending and no lifting more than five pounds "appear[ed] to be overly restrictive" "[b]ecause there [were few] neurological finding[s]," and "[i]t [was] reasonable that [Porco] [could] lift 10-25 pounds on occasion"; (2) although Porco reported headaches, possibly resulting from "cerebral spinal fluid leakage," he appeared able to move and carry pipes without difficulty on the video; (3) Porco's "[s]tanding activities" "could be limited," but he should be able to tolerate "[s]itting activities alternating with standing activities" based on "the lack of complaints noted during physical examinations"; and (4) "[t]he surveillance evidence . . . support[ed a finding] of functional capacity [for] sedentary to light work."[74]

35.  On September 12, 2005, Prudential decided to refer Porco's claim to a specialist to review

---

[74]*Id.* at 268-70.

12

his employability.[75]  That same day, it requested the names of Porco's current treating physicians.[76]  It repeated the request on October 6.[77]  Porco provided the information on October 12, indicating that he was currently under the treatment of Drs. Michael Chiang and Dennis Cook.[78]

36.   Dr. Day contacted both physicians.[79]  On October 28, 2005, he sent the surveillance footage of Porco to Chiang, with a request that he comment on it; Chiang apparently did not comment.[80]  Whether any response was received from Cook is not apparent in the record.  Prudential did not obtain medical records from either doctor at the time.

37.   On September 19, 2005, Prudential retained Malcolm Howard, MS, a "vocational consultant" to perform an "employability assessment" of Porco.  Prudential instructed Howard to base his assessment on Day's conclusions and the "Vocational Rehabilitation Education and Employment History" form completed by Porco.[81]  Howard completed the assessment on November 7, 2005.[82]  He spent a total of 9.1 hours preparing it.[83]

38.   Howard concluded that Porco's pre-disability position of "Corporate Warranty Quality Engineer" was consistent with a DOT designation[84] of Quality Control Technician.

---

[75]*Id.* at 272.

[76]*Id.* at 273.

[77]*Id.* at 278.

[78]*Id.* at 282, 284.

[79]*Id.* at 285.

[80]*Id.*

[81]*Id.* at 274.

[82]*Id.* at 287.

[83]*Id.* at 323.

[84]This refers to the "Dictionary of Occupational Titles" published by the U.S. Department of Labor in 1991.    (*Id.* at 290.)

Howard based this conclusion on the fact that Porco performed quality control functions using procedures and methods devised by others rather than developing procedures himself.[85]  Howard input this designation and the designations for Porco's work for various automobile dealerships into a computer program, and made various adjustments, including an adjustment for "claimant's orientation to 'people' (worker function rating), adding 'instructing' and 'supervising,' presumed to be inherent [in] pre-disability responsibilities and proclivities."[86]  Howard classified the maximum physical demands Porco could perform as "light," which he defined as "exerting up to 20 pounds of force occasionally, and/or 10 pounds of force frequently," "walking or standing to a significant degree," "sitting most of the time" with "pushing and/or pulling of arms or leg controls," or "constant pushing and/or pulling of materials even though the weight of those materials is negligible."[87]

39.   This resulted in 75 possible "occupational matches," which Howard reduced to 15 following review.[88]  Of these, Howard's report listed six as appropriate for Porco: Quality Control Technician; Automobile-Repair-Service Estimator; Service Manager; Superintendent, Maintenance; Shop Estimator; and Claims Clerk.[89]  Howard conducted a "labor market survey" of employment opportunities in the Los Angeles area.  He contacted ten employers identified via "[i]nternet directories" and *Los Angeles Times* want ads; he considered seven of these "informative."[90]

40.   Based on his research, Howard concluded: "[W]ork as a Service Manager with either an

---

[85]*Id.* at 288.

[86]*Id.* at 289.

[87]*Id.* at 289-90.

[88]*Id.* at 289.

[89]*Id.* at 290.

[90]*Id.* at 291-94.

automobile sales/service dealership or repair facility would appear in line with both Mr. Porco's qualifications and physical ability to perform.  He would likely need to be selective regarding dealerships pursued to ensure that the structure of existent positions allows adequate flexibility to sit/stand in line with his apparent need for position changes.  Of 7 informative employer contacts regarding such positions, all 7 indicated that he would qualify for consideration based on his prior experience performing such work, although 1 employer indicated that they hire from within from service advisor staff when such openings occur."[91]  Howard noted that "[s]tanding/walking was indicated to range from approx. 25% -90% of workdays, with 3 of 7 [employers] indicating 50% or less.  Hours per day would range from 10-12 hours.  Of 5 employers commenting, all 5 indicated that these positions would not require repetitive bending or any lifting demands.  Of 4 employers commenting, compensation, indicated as essentially commission-based across employers, ranged from $65,000-$108,000/year."[92]  Howard noted that a "Service Manager" position required a "light" level of physical exertion.[93]

41.   On November 16, 2005, having reviewed Howard's report, a Prudential claims manager concluded that, considering the occupations Howard had identified and Porco's physical limitations, Porco "would likely need to be selective regarding a potential employer, but it is clear that employment opportunities exist within his local labor market that can be performed within his current residual functional capacity."[94]

42.   On December 23, 2005, Prudential decided to terminate Porco's benefits, effective January 1, 2006.  It based this decision on the conclusion that Porco was "no longer precluded from performing [the] material and substantial duties of [a] regular occupation," as

---

[91]*Id.* at 294.

[92]*Id.*

[93]*Id.*

[94]*Id.* at 343.

"alternate gainful sed[entary] & light occupations ha[d] been identified."[95]  Prudential sent Porco a letter advising him of the decision.[96]  The letter summarized Prudential's review of Porco's medical history.[97]  It also referenced the surveillance video and the report of "an anonymous person who indicated that [Porco] [was] allegedly not functionally impaired by [his] medical condition."[98]  Echoing Dr. Day's conclusions, the letter stated that Porco's "restrictions to avoid bending and lifting over 5 pounds appear[ed] to be overly restrictive."[99]  Prudential acknowledgted that it was "reasonable" for Porco to avoid bending and lifting, but asserted that he could lift 10-25 pounds "on occasion" and that he should be able to tolerate "[s]itting activities alternating with standing activities."[100]  Finally, Prudential identified five occupations it believed Porco could perform, given his current skills and restrictions: industrial engineer; industrial engineering technician; transportation, storage, and distribution manager; occupational health and safety specialist and technician; and  first-line supervisor/manager of mechanics/installers/repairers.[101]  These positions differed from those discussed in Howard's report.

### F.    Porco's Appeal and Prudential's Upholding of the Denial of Benefits

43.    On January 5, 2006, Porco wrote Prudential, asserting that Prudential's review had failed to take into account the results of a November 3, 2005 appointment with Dr. Cook in which Porco's urinary incontinence and self-catherization were discussed.[102]  Porco also

---

[95]*Id.* at 346.

[96]*Id.* at 347-351.

[97]*Id.* at 348-49.

[98]*Id.* at 349.

[99]*Id.*

[100]*Id.*

[101]*Id.* at 350.

[102]*Id.* 359.

indicated that he had seen Dr. Chiang on December 21, 2005 and January 4, 2006 "for severe leg and lower back pain on both sides and the continued worsening bowel problem."[103]   Porco requested that Prudential review its determination in light of this information.   On January 20, 2006, Prudential notified Porco that it had received and would process his request for reconsideration.   Proco's appeal thus commenced.[104]

44.   Prudential obtained the medical records from Cook's office referenced by Porco.   The records indicate that Porco saw Cook on September 8, 2005 for "problems with . . . urinary incontinence."   Cook diagnosed "probable neurogenic bladder dysfunction, poor bladder emptying, and urinary incontinence."   To facilitate further analysis, Cook prescribed a urine culture, renal ultrasound, "KUB," and cytoscopy.   He noted that Porco might "need to be started on intermittent catheterization."[105]   On November 3, 2005, Cook "instructed [Porco] on performing self intermittent catheterization," and advised him to perform the procedure three times a day.[106]   After a November 17, 2005 follow-up appointment, Cook reported that Porco was "doing well" and "[n]o longer ha[d] incontinence."   Cook noted Porco would likely have to continue with intermittent catheterization.[107]

45.   Prudential also obtained medical records from the consultations with Chiang referenced in Porco's letter.   In a December 21, 2005 record, Chiang noted that Porco "continue[d] to have chronic lower back pain," and recorded his complaints of leg pain.   Chiang observed that Porco "still has pain on a regular daily basis. . . .   [He] was described to be uncomfortable, even sitting here for a short duration and he has constantly moved around

---

[103]*Id.*

[104]*Id.* at 372.

[105]*Id.* at 368.

[106]*Id.* at 364.

[107]*Id.* at 361.

in the chair to find a comfortable position as sitting very long in one position aggravates his low back pain." Chiang noted that Porco "complain[ed] of chronic constipation. . . worsened by Vicodin." Chiang prescribed medication for this condition.[108]

46.   On January 4, 2006, Chiang recorded Porco's complaints of "shooting electrical pain" in his lower back and legs, and pain when sitting or standing for extended periods of time. He noted that Porco was "losing more and more control of [his] bladder function" and sometimes suffered from urinary incontinence; Porco's "ongoing constipation" was "slightly better." Chiang diagnosed Porco with "chronic pain syndrome" and noted that he "still suffer[ed] from quite a bit of pain." He recommended that Porco see Blair for a follow-up neurological consultation, noting that Porco might "be a candidate for proceeding with surgical intervention at this time as [he] is experiencing more neurological deficit possibly as a result of nerve impingement."[109] Chiang considered Porco's pain a "worsening issue."[110]

47.   On February 2, 2006, Prudential submitted Porco's medical file to a company known as "MES Solutions" for review by a physician specializing in neurology.[111] Dr. Michael Partnow, a neurologist, reviewed the file.

48.   Partnow concluded that Porco did not have any functional impairments as of January 1, 2006, based on his review of the medical records and surveillance footage. Partnow stated that "[a]t no time ha[d] [Porco] been found to have abnormality on exam other than inconsistent findings of a deep tendon reflex decrease and sensory decrease on his right big toe. His pain is treated with medicine and he told the urologist he was no longer

---

[108]*Id.* at 390.

[109]*Id.* at 388.

[110]*Id.*

[111]*Id.* at 392.

incontinent."[112]  Partnow opined that "[i]f there were to be any restriction, it would be in terms of his being permitted to vary his activity from standing to sitting and back periodically," but reiterated that "[t]he man on the video surveillance has no restrictions."[113]  He noted that "[i]t is not clear that [Porco] is receiving any treatment other than his indication that he is self-catheterizing, and his seeming indication of using analgesic medication."[114]  Partnow further observed:

> Mr. Porco may be having chronic pain.  The MRI reports, and their interpretations by attending specialists are inconsistent.  However, there does seem to be a common thread throughout that spinal stenosis is present.  His MRI finding is a chronic one, most likely that of spinal stenosis. . . .  [Porco] consistently complains of pain radiating to both legs.  He has minor findings on exams performed by various doctors, although these findings are inconsistent.  Also, the video surveillance does not show him suffering while performing physical activities around the exterior of a dwelling."[115]

49.   On March 1, 2006, Prudential decided to uphold the denial of benefits.  The reasons for the decision, as outlined in a March 1 letter to Porco, were consistent with Partnow's conclusions.[116]  The letter advised Porco that he had the right to appeal the decision to Prudential's Appeals Unit; it noted that any appeal had to be filed within 180 days of the date of the letter.[117]  The letter stated that once he had completed an administrative appeal,

---

[112]*Id.* at 409.

[113]*Id.* at 410.

[114]*Id.*

[115]*Id.* at 411.

[116]*Id.* at 414.

[117]*Id.* at 416.

Porco could also pursue an appeal at the district court level; it stated that a second appeal to Prudential was voluntary, and that the "decision . . . whether to file a second appeal w[ould] not affect [his] right to sue under ERISA."[118]

### G.   Porco's Attempted Second Appeal

50.   Proco's counsel submitted a letter to Prudential on February 20, 2007, "demand[ing] reprocessing of the disability claim."[119]   With the letter, counsel submitted additional evidence not previously in the administrative record before Prudential.

51.   On March 15, 2007, Prudential indicated that it would not consider the appeal, as it was submitted more than 180 days after the March 1, 2006 letter had been sent.[120]   Because the court concludes below, *infra*, Part II.C, that it should decline to exercise its discretion to consider the material submitted with the March appeal, it does not describe that material here.

52.   Porco filed this action on March 5, 2008.

53.   Any findings of fact that are deemed to be conclusions of law are incorporated herein as such.

## II.   CONCLUSIONS OF LAW

### A.   Standard of Review

54.   The Plan is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §§ 1001 et seq.

55.   "[D]istrict courts must review [ERISA] claims [challenging a denial of benefits] *de novo* unless the discretion to grant or deny claims is 'unambiguously retained' by a plan administrator or fiduciary." *Thomas v. Or. Fruit Prods., Co.*, 228 F.3d 991, 994 (9th Cir. 2000) (citing *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1090 (9th Cir. 1999) (en

[118]*Id*. at 417.

[119]*Id*. at 434.

[120]*Id*. at 537.

1    banc)); see also *Firestone Tire & Rubber Co. v. Brunch*, 489 U.S. 101, 115 (1989) (the

2    court reviews challenges to an ERISA plan's denial of benefits *de novo* "unless the benefit

3    plan gives the administrator or fiduciary discretionary authority to determine eligibility for

4    benefits or to construe the terms of the plan"). Here, the parties agree that the applicable

5    standard of review is *de novo*.[121]

6    56.   "[T]he District Court's 'de novo review of the parties' submissions' and resolution thereof,

7          can best be understood as essentially a bench trial 'on the papers' with the District Court

8          acting as the finder of fact." *Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 124 (2d

9          Cir. 2003);see also *Kearney*, 175 F.3d at 1094-95 (holding, in an ERISA disability benefits

10         case, that "[a] majority of us conclude that, in its discretion, . . . the district court may try

11         the case on the record that the administrator had before it").

12   **B.    Burden of Proof**

13   57.   The parties dispute which of them has the burden of proof in this case. Porco argues that

14         "because LTD benefits were paid until December 31, 2005, with no evidence that [his]

15         condition changed for the better," defendants bear the burden of showing that he was no

16         longer disabled at the time Prudential terminated his benefits.[122] Porco cites *Levinson v.*

17         *Reliance Standard Life Ins. Co.*, 245 F.3d 1321, 1331 (11th Cir. 2001), in support of this

18         position. In *Levinson*, the court concluded that because plaintiff submitted evidence that

19         he was totally disabled, thus "satisf[ying] his obligations under the terms of the plan," the

20         defendant "had to produce evidence showing that Levinson was no longer disabled in order

21         to terminate his benefits." *Id.* Although the *Levinson* court noted that the plan

22         administrator objected to this shifting of the burden of proof, it did not address the

23         objection and merely noted that the plan participant had submitted some evidence that re

24         was totally disabled under the terms of the plan. *Id.* The *Levinson* court shifted the burden

25

26         [121]Plaintiff's Revised Opening Trial Brief ("Pl.'s Brief") at 18; Defendants' Opening Trial

27   Brief ("Def.'s Brief") at 12.

28         [122]Pl.'s Brief at 19.

to the defendant after concluding that plaintiff had "satisfied his obligations under the terms of the plan." *Id.* Here, the terms of the Plan obligated Porco to submit satisfactory proof of continuing disability at Prudential's request.[123] Whether Porco satisfied this obligation to substantiate his continuing disability adequately is the ultimate issue the court must decide.

58. Because the terms of the Plan place the burden of proving continuing disability on the participant, as even the *Levinson* court acknowledged, and because Porco's satisfaction of that obligation is the issue the court must decide in this action, the court finds that Porco has the burden of proof. See *Miller v. Metropolitan Life Ins. Co.*, 925 F.2d 979, 985 (6th Cir. 1991) ("Plaintiff implies that once disability benefits are conferred, the burden of proof lies with the insurance company to prove that the employee can return to her former regular employment. However, under the terms of the Plan, it is the employee who must continue to supply on demand proof of continuing disability to the satisfaction of the insurance company"); *Cossio v. Life Ins. Co. of North America*, 240 F.Supp.2d 388, 392 n. 2 (D. Md. 2002) ("Courts have held that policy language requiring an insured to submit 'proof of continued disability' shifts the burden of proof to the insured"); see also *Muniz v. AMEC Const. Management*, No. CV-07-8066 CAS (AJWx), 2009 WL 866843, *5 (C.D. Cal. Mar. 30, 2009) ("The parties dispute which party bears the burden of proof in this case. Generally, a plaintiff suing for benefits under ERISA, 29 U.S.C. § 1132(a)(1)(B), must establish his entitlement to benefits. See *Farley v. Benefit Trust Life Ins. Co.*, 979 F.2d 653, 658 (8th Cir.1992); see also *Horton v. Reliance Standard Life Ins. Co.* ., 141 F.3d 1038 (11th Cir.1998) (citing *Farley*). Muniz attempts to argue that, as here, where an insurer seeks to terminate disability benefits as opposed to refusing to award them in the first place, the burden of proof shifts to the defendant. This is unsupported by case law, as numerous courts, including several within this circuit, have consistently held that the burden of proof remains with the plaintiff in just such a case"

---

[123]*Id.* at 604.

1    (collecting cases)).

2    59.   a second threshold issue the court must address is the parties' dispute concerning the

3          materials submitted with the February 20, 2007 appeal.   As noted, Prudential denied

4          Porco's initial appeal on March 1, 2006.   At that time, it sent Porco a letter stating that he

5          had 180 days within which to submit a second appeal.   It noted that Porco could proceed

6          directly to district court, and that his "decision on whether to file a second appeal w[ould]

7          not affect [his] right to sue under ERISA."[124]   Porco attempted to file a second appeal on

8          February 20, 2007, which Prudential denied as untimely.   The parties dispute whether the

9          court should consider the approximately 100 pages of material submitted with Porco's

10         second appeal.

11   60.   Porco frames the question as whether the material is "part of the administrative record."[125]

12         Defendants lodged the material as part of the administrative record on January 16, 2009,

13         the same day they filed their opening trial brief.   The proper question is not whether the

14         records are part of the administrative record, however, but what consideration the court

15         should accord them given that they were not part of the administrative record *before*

16         *Prudential* at the time of the benefits denial that is the subject of this appeal.   See *Silver*

17         *v. Executive Car Leasing Long-Term Disability Plan*, 466 F.3d 727, 731 n. 2 (9th Cir.

18         2006) (" In general, a district court may consider only evidence within the administrative

19         record at the time of the administrator's decision," citing *Taft v. Equitable Life Assurance*

20         *Soc'y*, 9 F.3d 1469, 1472 (9th Cir.1993));   *Kearney*, 175 F.3d at 1090 ("If a court reviews

21         the administrator's decision, whether de novo. . . or for abuse of discretion, the record that

22         was before the administrator furnishes the primary basis for review").

23   61.   Prudential's March 1, 2006 denial of Porco's initial appeal is the decision that Porco has

24         appealed to this court.   The complaint makes no mention of, and does not challenge,

25         Prudential's refusal to consider his February 20, 2007 appeal.   Notwithstanding this fact,

26   _____

27   [124]AR at 351.

28   [125]Plaintiff's Responsive Trial Brief ("Pl.'s Reply") at 4.

23

Porco argues in his responsive brief that it was "error" for Prudential to refuse to consider the second appeal.[126]  The court, however, finds that Prudential did not err in refusing to consider the second appeal.

62.  29 U.S.C. § 1133 requires that an ERISA plan provide an appeal process.  It states: "In accordance with regulations of the Secretary, every employee benefit plan shall . . . afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim."  Pursuant to the authority granted by this provision, 29 C.F.R. § 2560.503-1 sets forth procedural requirements to ensure a "full and fair review."  Among these is a requirement in paragraph (h)(3)(i) that the appeal process provide a claimant "at least 180 days following receipt of a notification of an adverse benefit determination within which to appeal the determination."[127]

63.  Prudential satisfied this requirement when it afforded Porco the opportunity to appeal the initial decision.[128]  Prudential's claims procedures, set forth in a document designated "ERISA Statement," also provide for a second and third opportunity to appeal, each with a 180-day filing period following notice of the determination.[129]  Adhering to its procedures, Prudential's March 1, 2006 letter to Porco notified him of the 180-day time limit for filing a second appeal.  It also notified him that he had the option of pursuing an appeal before the district court rather than filing a second appeal with Prudential.

64.  Porco argues that the 180-day time limit should not apply to the second appeal, because the ERISA statement says that it is "not part of the Group Insurance Certificate" and is

---

[126]*Id.* at 2.

[127]Under paragraph (h)(4), this requirement applies to "a plan providing disability benefits."

[128]AR at 353.

[129]*Id.* at 613, 615-16.

therefore not a "plan document."[130]  Porco relies on *Besser v. Prudential Ins. Co. of America*, Civil No. 07-00437 SOM/BMK, 2008 WL 4483796 (D. Haw. Sept. 30, 2008). In *Besser*, the district court held that an "ERISA statement" issued by Prudential was not a "plan document," and therefore did not vest discretion in a plan administrator. Consequently, it employed a *de novo* standard to review Prudential's benefits decision. *Id.* at *5.  The *Besser* court relied on the Ninth Circuit's holding in *Kearney*, 175 F.3d at 1089, that "the default is that the administrator has no discretion, and the administrator has to show that the plan gives it discretionary authority in order to get any judicial deference to its decision." See *id.* at *2.  The ERISA statement's status as a plan document was relevant in *Besser* because if the statement was not a plan document, it could not, under governing law, vest discretion in the plan administrator such that its benefits decisions were reviewed under a deferential standard.  Porco appears to suggest that because the ERISA statement is not a "plan document," it cannot control the time limit for his second appeal, and he was therefore entitled to file the appeal at any point.  Nothing in the statutory or regulatory structure of ERSIA, however, gives Porco a right to file a second appeal before proceeding in district court, or imposes a minimum time period for doing so.  The only sources of the right to file a second appeal to which Porco can point are the March 1, 2006 letter and the ERISA statement itself.  Both of these clearly specified a 180-day limit on the filing of an optional second appeal.  Porco does not identify any statutory or regulatory provision that entitles him to a second voluntary appeal.  Absent such a provision, the court concludes that Prudential was not required to consider Porco's untimely second appeal.[131]

---

[130]*Id.* at 612.

[131]Porco notes that the ERISA statement provides for a third voluntary appeal on denial of a second appeal with another 180-day window, and argues his second appeal was timely because it was filed within the combined time limit for the second and third appeals.  The court does not find this argument persuasive.  The only source of the right to file a third appeal on denial of the second appeal is the ERISA statement that Porco urges does not control.

65.   This does not, however, end the court's inquiry.  As Porco has cited to the material submitted as part of the second appeal, the court must consider whether, in its discretion, it should consider the information in reviewing the March 1, 2006 decision despite the fact that it was not before the plan administrator.  Because the court's review is *de novo*, it has limited discretion to consider material not before the plan administrator.

66.   In *Mongeluzo v. Baxter Travenol Long Term Disability Ben. Plan*, 46 F.3d 938, 943 (9th Cir. 1995), the Ninth Circuit joined the Third, Fourth, Seventh, Eighth, and Eleventh Circuits in "permit[ting] the admission, under carefully circumscribed conditions, of new evidence that was not part of the record before the plan administrator" when the district court reviews a denial of benefits *de novo*.  *Id.*; see also *Silver*, 466 F.3d at 731 n. 2 (citing *Mongeluzo*).   In elaborating on the standard a district court should apply in exercising its discretion to consider evidence not before the plan administrator, the *Mongeluzo* court cited *Quesinberry v. Life Ins. Co. of North America*, 987 F.2d 1017, 1025 (4th Cir.1993):

> "[W]e . . . believe that the purposes of ERISA . . . warrant significant restraints on the district court's ability to allow evidence beyond what was presented to the administrator.  In our view, the most desirable approach to the proper scope of *de novo* review under ERISA is one which balances the [ ] multiple purposes of ERISA. Consequently, we adopt a scope of review that permits the district court in its discretion to allow evidence that was not before the plan administrator. The district court should exercise its discretion, however, only when circumstances clearly establish that additional evidence is necessary to conduct an adequate *de novo* review of the benefit decision.  In most cases, where additional evidence is not necessary for adequate review of the benefits decision, the district court should only look at the evidence that was before the plan administrator . . . at the time of the determination."  *Id.* at 943-44

1   (alteration original).

2   The *Mongeluzo* court emphasized, however, that "a district court should not take additional

3   evidence merely because someone at a later time comes up with new evidence that was not

4   presented to the plan administrator." *Id.* at 944; see also *Quesinberry*, 987 F.2d at 1027

5   ("[I]f the evidence is cumulative of what was presented to the plan administrator, or is

6   simply better evidence than the claimant mustered for the claim review, then its admission

7   is not necessary"); *Thomas v. Continental Cas. Co.*, 7 F.Supp.2d 1048, 1056 (C.D. Cal.

8   1998) ("In every case there will always be relevant evidence that is not part of the

9   administrative record. . . . *Mongezulo* was concerned that the purposes of ERISA would

10  be frustrated by courts conducting extensive fact-finding in routine cases"). Thus, "'in

11  most cases,' only the evidence that was before the plan administrator should be

12  considered." *Kearney*, 175 F.3d at 1084 (citing *Mongeluzo*, 46 F.3d at 944).

13  67.   In *Opeta v. Northwest Airlines Pension Plan for Contract Employees*, 484 F.3d 1211, 1218

14  (9th Cir. 2007), the court, applying *Monteluzo*, cited *Quesinberry*'s "non-exhaustive list

15  of exceptional circumstances" in which the consideration of additional evidence may be

16  necessary:

17  "claims that require consideration of complex medical questions or

18  issues regarding the credibility of medical experts; the availability of

19  very limited administrative review procedures with little or no

20  evidentiary record; the necessity of evidence regarding interpretation

21  of the terms of the plan rather than specific historical facts; instances

22  where the payor and the administrator are the same entity and the

23  court is concerned about impartiality; claims which would have been

24  insurance contract claims prior to ERISA; and circumstances in

25  which there is additional evidence that the claimant could not have

26

27

28

27

1          presented in the administrative process."[132]

2    68.   The additional material submitted in support of Porco's untimely appeal includes various

3          medical records from Dr. Chiang's office for the period from June 6, 2004 to September

4          19, 2006;[133] various additional medical records, including a neurological assessment by Dr.

5          Howard Morgan, a professor of neurosurgery at the University of Texas' Southwestern

6          Medical Center in Dallas, dated May 4, 2006;[134] and a report regarding Porco's

7          employability prepared on September 27, 2006 by Barbara A. Dunlop, a certified

8          rehabilitation counselor, at the request of Porco's counsel.[135]

9    69.   Here, the only potentially applicable circumstances that would warrant consideration of

10         Porco's additional evidence are the complexity of the medical issues involved and the

11         credibility of medical experts.   Prudential's administrative procedures gave Porco the

12         opportunity to supplement the administrative record, and he was not prevented from

13         presenting further evidence during the administrative process.   There is nothing indicating

14         that the claim would have been an insurance contract claim prior to ERISA.   Finally,

15         although the payor and administrator are the same here, this is often the case in the review

16         of a benefits decision,  and the identity of the payor and administrator, by itself, does not

17         provide a ground to consider additional evidence, absent additional reason for concern

18         regarding impartiality.   See *Ross v. Prudential Ins. Co. of America*, No. CV

19         05-2936-PHX-DGC, 2006 WL 2460919, *3 (D. Ariz. Aug. 23, 2006) ("Additional

20         evidence is not necessarily appropriate every time an administrator and payor are the same

21   _____

22         [132]Although the claimant's inability previously to proffer it is a circumstance favoring
23   consideration of evidence not before the administrator, the Ninth Circuit has cautioned in an
     unpublished opinion that "[t]here is no requirement that the proponent of the evidence demonstrate
24   inability to present it earlier."  *Beaty v. Prudential Ins. Co. of America*, 313 Fed.Appx. 46, 48
     (9th Cir. Feb. 13, 2009) (Unpub. Disp.).
25

26         [133]*Id.* at 443-499.

27         [134]*Id.* at 501-503.

28         [135]*Id.* at 525-34.

party.  As noted in *Hall v. Unum Life Ins. Co.*, 300 F.3d 1197 (10th Cir.2002), 'the administrator and the payor are often the same party for many ERISA benefit plans.  If [district courts] were to adopt a blanket rule that the admission of additional evidence should be allowed whenever the same party is the administrator and payor, then it will not be the unusual case in which additional evidence is admitted.' *Id.* at 1205.  As noted in the language quoted above from *Quesinberry*, there should be an identity between the administrator and payor *and* reason for concern about impartiality. *Quesinberry*, 987 F.2d at 1027" (emphasis and alteration original)).  On the present record, the fact that Prudential was both payor and administrator does not raise sufficient concerns regarding impartiality to warrant the consideration of evidence not before it at the time it made the benefits decision.

70.   Numerous physicians, however, commented on the complexity of Porco's spinal problem. While this complexity is a circumstance that might warrant consideration of additional medical evidence, the existing record documents consultations with and the opinions of numerous neurologists. The court believes these records are sufficient to conduct an adequate review of Prudential's decision.  While further reports might be helpful, the report by Dr. Morgan is generally cumulative of the observations of the other neurologists. Given the substantial medical evidence already in the record, the court cannot say that the "circumstances clearly establish that additional evidence is necessary to conduct an adequate *de novo* review of the benefit decision." *Mongeluzo*, 46 F.3d 943-44.  It therefore declines to consider the additional material.[136]

**C.    Whether Porco Was Totally Disabled Under the Terms of the Plan at the Time of the Denial of Benefits**

71.   In determining whether Porco was totally disabled at the time Prudential decided to terminate his benefits, the court begins with Prudential's determination on July 7, 2004 that

---

[136]As the court finds in Porco's favor without reviewing the material, he is in any event not prejudiced by the determination that consideration of it is inappropriate.

he was totally disabled under the terms of the plan.   This is strong evidence that the medical evidence available to Prudential at the time indicated that Porco was totally disabled.  See *McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 589 (8th Cir. 2002) ("We are not suggesting that paying benefits operates forever as an estoppel so that an insurer can never change its mind; but unless information available to an insurer alters in some significant way, the previous payment of benefits is a circumstance that must weigh against the propriety of an insurer's decision to discontinue those payments").

72.   Indeed, the court's review of the evidence available to Prudential as of July 7, 2004, confirms that it strongly indicated Porco was totally disabled.  Although their diagnoses somewhat differed, multiple neurologists – Drs. Lawner, Johnson, Yadegar, Quinonez, Blair and Halliday – all agreed that Porco suffered from a complex and unusual malady of his spine, most frequently identified as either myelomeningocele or spinal stenosis.[137] Throughout this period, Porco consistently reported to his physicians that he experienced severe pain in his legs or back.  Among other things, Porco reported "constant pain" in his buttocks and "shooting pain" in his right leg to Johnson;[138] shooting pain in his legs to Yadegar;[139] "severe pain at level 10 most of the time" in his mid lumbar area, hips, and lower extermities to Quinonez;[140] chronic, sharp pain in his right leg and a "constant" "sensation of someone cutting into his sacrum with a knife" to Blair;[141] and a stabbing pain in his buttocks and legs at level 7-8 out of ten to Halliday.[142]  Doctors noted that Porco's

---

[137]*Id.* at 27, 31, 96-97, 169,  212, 242.

[138]*Id.* at 29.

[139]*Id.* at 96.

[140]*Id.* at 212.

[141]*Id.* at 160.

[142]*Id.* at 242.

pain was not relieved by medication.[143]   Porco consistently reported that sitting and standing exacerbated the pain.  Nothing in the physicians' reports suggest that any of them believed that Porco was manufacturing or exaggerating his complaints of pain; rather, they appear to have viewed them as consistent with the diagnosed problems with his spine.

73.   Multiple physicians concluded that Porco was either unable to work or significantly impaired in his ability to work due to his spinal condition and the resulting pain.  Lawner determined that, as of June 21, 2002, Porco was unable to perform the duties of his position.[144]   On September 26, 2002, his primary care physician indicated that Porco should not lift over five pounds, and should avoid bending, climbing, pushing or pulling.[145] On May 3, 2004, Blair concluded that Porco was "unable to work."[146]

74.   Prudential's reassessment of Porco's disability was triggered by the surveillance video recorded at the end of July 2005.  Having reviewed the surveillance video, the court finds it of little assistance in assessing Porco's condition.  The video depicts Porco carrying a floppy length of pipe[147] for less than a minute, and pulling a wheel barrow for thirty seconds.  Although the weight of the pipe is unclear, it could easily be under five pounds; the contents of the wheel barrow appears somewhat more likely to exceed five pounds. The fact that Porco performed the tasks on the date the video was taken for the brief time depicted does not indicate that he could necessarily perform them repeatedly as part of the duties of a daily occupation, however.  See *Hanusik v. Hartford Life Ins. Co.*, No. 06-11258, 2008 WL 283714, * 4 (E.D. Mich. Jan. 31, 2008) ("Hartford's reliance on the video surveillance of Plaintiff in deciding to terminate her LTD benefits was neither

[143]*Id.* at 29, 160.

[144]*Id.* at 7.

[145]*Id.* at 94.

[146]*Id.* at 174.

[147]The court rejects Porco's efforts to establish the precise weight of the pipe based on information of questionable reliability obtained from the internet.  (Pl.'s Reply at 17.)

reasonable nor rational.  Hartford makes much of the fact that it captured footage of Plaintiff in the acts of, among other things, walking for about a mile on five occasions for about a half hour; operating a car on five occasions; going to church on two occasions; and scratching her back on two occasions.  However, it was never alleged that Plaintiff was unable to do any of these activities. . . .  Dr. Slain indicated that Plaintiff was unable to do all of those activities on the same day for a continuous period of eight or four hours. . . .  [T]he video surveillance fails to show Plaintiff either performing any single or combination of activities for an eight or four hour period, or strenuously exerting herself over the course of two consecutive days").

75.   Further, the surveillance of Porco appears to have been fairly constant over three days.  The fact that less than two minutes of footage shows Porco engaged in physical activity other than walking suggests that he was not particularly active during the surveillance period.

76.   Finally, although Porco walks without difficulty in the footage, the neurologists who found that he suffered from severe pain noted that he walked with a normal gait.[148]  Details that might assist in determining whether Porco was experiencing pain at the time the video was recorded – e.g., his facial expression – are not discernible from the footage.

77.   On September 1, 2005, Day reviewed the medical evidence discussed above and the surveillance video.  Given the substantial evidence provided by doctors who examined Porco regarding his pain and ability to work, the court finds Day's report unpersuasive, his conclusions are vaguely stated and only generally supported.  Day concluded that it was "overly restrictive" to limit Porco to lifting more than five pounds "[b]ecause there are little neurological finding[s]."[149]  He concluded that Porco could lift 10-25 pounds "on occasion."[150]  It is not clear what Day's reference to a lack of "neurological findings"

[148]AR at 31 (noting Porco's "smooth stride"); 243 ("normal gait").

[149]*Id.* at 269.

[150]*Id.*

means.  Multiple neurologists concluded that Porco suffered from a significant spinal problem that resulted in severe pain.  It seems obvious that such a condition would support restrictions on lifting, as lifting places stress on the spine.  Day also concluded that "the surveillance evidence would . . . support . . . [a] functional capacity of sedentary to light work."[151]   Given the limited utility of the surveillance evidence, the court considers opinions regarding Porco's ability to work rendered by physicians who examined him over time more credible than conclusions reached based on observing the video.

78.  The propriety of Prudential's denial of benefits is also called into question by its reliance on Howard's report.  Howard's findings were purportedly intended to take into account the restrictions by Day; among these was the limitation that Porco could lift ten pounds "on occasion."   Howard concluded that Porco could perform the duties of several positions, including those of a Service Manager at an automobile dealership or repair facility.  According to Howard's report, this position requires a "light" level of physical exertion, and encompasses lifting ten pounds "frequently."[152]   Even putting aside the court's concerns regarding the validity of Day's conclusions, Howard's report is inconsistent with the restrictions Dr. Day recommended, despite the fact that it purportedly applied those restrictions.

79.  Howard's addition of "instructing" and "supervising" to Porco's skill set based on an assumption that these abilities were "inherent pre-disability responsibilities and proclivities"[153] further undercuts the reliability of his report, as there is no evidence in the record that Porco's experience included management or supervision or that he had "proclivities" in these areas.

80.  Even more puzzling is the list of potentially available occupations cited in Prudential's December 23, 2005 denial letter.  Most of these positions are different than the positions

_____

[151]*Id.* at 270.

[152]*Id.* at 290.

[153]*Id.* at 289.

33

discussed as possibilities in Howard's report. There is nothing in the record to indicate why Prudential concluded that Porco could perform the duties of the cited positions, and Prudential does not address the anomaly in its briefs on appeal.

81. After Porco filed his appeal, Prudential received further information that his condition remained the same as his condition at the time of its initial finding of total disability. During a December 2005 office visit, Dr. Chiang noted that Porco was visibly uncomfortable sitting and experienced pain "on a regular daily basis."[154] Chiang's records indicate that as of January 2006, Porco continued to suffer chronic "shooting electrical pain" in his legs and lower back that was exacerbated by extended sitting and standing.[155]

82. In upholding the denial of benefits on March 1, 2006, Prudential relied on a review of Porco's file by Dr. Partnow. Partnow concluded that Porco "had no functional impairments from [January 1, 2006] forward."[156] In so concluding, Partnow ignored extensive evidence regarding Porco's history of severe pain, stating simply that "[h]is pain is treated with medicine."[157] Partnow's report says nothing about the substantial evidence in the file that Porco's pain was not relieved by medication. It is clear that Partnow relied heavily on the surveillance video, as he repeatedly references it to support his conclusions.[158] He cites nothing, for example, to support his conclusion that Porco's chronic pain does not prevent him from working beyond his impressions of "the man on the video." Partnow's report reflects a refusal, presumably derived from impressions of

---

[154]*Id.* at 390.

[155]*Id.* at 361, 388. The court does not address Porco's urinary and bowel difficulties, as there was no evidence in the record that these issues added to his inability to work.

[156]*Id.* at 409.

[157]*Id.*

[158]*Id.* at 409-411 ("The video I watched clearly shows a man capable of physical activity without difficulty"); ("The man on the video surveillance has no restrictions"); ("He was observed on the surveillance to be functioning easily"); ("[T]he video surveillance does not show him suffering"), etc.

the video footage, to believe any of Porco's consistent self-reports of pain.[159]   Indeed, Partnow expresses doubt, without citation to any portion of the record, as to whether Porco was self-catheterizing.[160]   The overall impression created by Partnow's report is that he viewed the surveillance video, unreasonably reached a conclusion based solely on that evidence, and did not conduct a thorough and dispassionate examination of the medical evidence.  This impression is confirmed by the fact that on at least one occasion the report misstates the facts in the record in a manner indicating a rushed and careless review. Partnow states that Porco is "no longer incontinent," apparently on the basis of a statement Porco made to Cook in November 2005; the record indicates, however, that Dr. Chiang noted in January 2006 that Porco "will sometimes. . . suffer from urinary incontinence."[161] After considering Partnow's report, the court concludes that Prudential's reliance on it was unreasonable.

83.   In sum, the court finds it more likely than not that Porco met the Plan definition of total disability at the time of the denial of benefits on March 1, 2006.  All of the medical evidence in the record at that time indicated that following the operation on April 11, 2002, Porco's history of chronic pain, related to a complex spinal problem, became worse; and that, thereafter, he consistently suffered severe pain in his lower body.  In 2002, his doctor restricted him to lifting no more than five pounds based on these symptoms; the records supports a conclusion that Porco's condition did not substantially improve since

---

[159]*Id.* at 410.

[160]See, e.g., *id.* at 411 ("He can function with pain medication and self-catheterization (if he is indeed fol[l]owing such treatment)"); *id.* at 410 ("If he truly is self catheterizing . . .").

[161]*Id.* at 388.  Porco suggests that Dr. Partnow did not consider Dr. Chiang's records in conducting his review.  (Pl.'s Reply at 11.)  It is unclear whether this is the case; although the records were received by Prudential prior to Partnow's review, his report does not specifically reference them.  If Dr. Partnow conducted his review without considering Dr. Chiang's records, this would strengthen the court's conclusion regarding its reliability.

then.[162]  Dr. Day's and Dr. Portnow's reports are the only evidence that the restrictions imposed in 2002 were inappropriate; the court does not find their reports to be credible. There is no evidence in the record that Porco is qualified for a position within the restrictions originally imposed, as Howard utilized different restrictions in conducting his vocational assessment.  Moreover, Dr. Blair, a neurologist who treated Porco on numerous occasions, opined in 2004 that pain related to Porco's spinal problem rendered him unable to work.  As Porco's condition remained the same in 2006, the court finds it more likely than not that Porco met the definition of "total disability" in that he was "unable to perform the duties of any gainful occupation for which [he was] reasonably fitted by education, training or experience."  Accordingly, Prudential's denial of benefits was wrong, and Porco is entitled to continued receipt of disability benefits.

84.  Because the court concludes that Prudential reached the wrong conclusion as to whether Porco remained totally disabled, Porco is entitled to retroactive reinstatement of benefits. See *Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1163 (9th Cir. 2001) ("Paul Revere did not misconstrue the definition of 'disabled,' or apply the wrong standard to evaluate Grosz-Salomon's claim.  It applied the right standard, but came to the wrong conclusion.  Under these circumstances, remand is not justified.  Retroactive reinstatement of benefits was proper" (footnotes omitted)).

85.  "The Ninth Circuit has held that a district court may award prejudgment interest in ERISA cases to compensate a plaintiff for the loss he incurred as a result of the defendant's nonpayment of benefits.  See *Dishman v. UNUM Life Ins. Co. of America*, 269 F.3d 974, 988 (9th Cir.2001).  Whether to award prejudgment interest 'is a question of fairness, lying within the court's sound discretion, to be answered by balancing the equities.'  See *Shaw v. International Association of Machinists*, 750 F.2d 1458 (9th Cir.1985). Appropriate considerations include whether the 'financial strain' of paying prejudgment

---

[162]The only evidence in the record that potentially indicates a change in condition is the surveillance footage.  The court has explained why it believes this evidence is entitled to limited weight.

interest would injure other plan beneficiaries, and whether the defendants acted in bad faith. See *id.*; see also *Dishman*, 269 F.3d at 988." *Fleming v. Kemper Nat. Services, Inc.*, 373 F.Supp.2d 1000, 1012 (N.D. Cal. 2005).

86.   Defendants have not argued that an award of prejudgment interest is inappropriate in this case, or presented evidence that such an award would result in financial hardship. As the court has concluded that Porco was entitled to benefits at the time they were terminated, it finds that an award of prejudgment interest is appropriate to make him whole. See *id.* at 1013 ("There is no evidence that defendants would suffer any financial hardship by paying prejudgment interest to Fleming, nor that any other beneficiary of the plans would suffer as a result. Had defendants properly reviewed Fleming's claim and focused on the effects of her pain and her pain medication on her ability to function in her position as a financial analyst, Fleming would have received long ago the benefits to which she is entitled. Fleming is entitled to an award of prejudgment interest to make her whole").

87.   Generally, "the interest rate prescribed for post-judgment interest under 28 U.S.C. § 1961 is appropriate for fixing the rate of pre-judgment interest unless the trial judge finds, on substantial evidence, that the equities of that particular case require a different rate." *Blankenship v. Liberty Life Assurance Co. of Boston*, 486 F.3d 620, 627 (9th Cir. 2007) (quoting *Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1163-64 (9th Cir. 2001)). "Substantial evidence" is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Blanton v. Anzalone*, 813 F.2d 1574, 1576 (9th Cir. 1987)). Post-judgment interest is "calculated . . . at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding. the date of the judgment." The Treasury bill rate has varied widely during the period from March 1, 2006 to the date of the entry of judgment. Consequently, the court concludes it would be equitable to award pre-judgment interest at a higher rate than the current rate for Treasury bills.

88.   During the period from January 1, 2006 to January 19, 2010, the 1-year constant maturity

1   Treasury yield has ranged from a low of 0.26%, on November 25, 2009, to a high of

2   5.3%, on June 26, 2006.  Averaging the daily yields over this period produces a rate of

3   2.91%. Because the current yield rate is near the lowest value for the period, and rates

4   during portions of the period were significantly higher, the court finds it equitable to award

5   pre-judgment interest at the average rate of 2.91%.

6   89.   Any conclusions of law that are deemed to be findings of fact are incorporated herein as

7   such.

9   **III. CONCLUSION**

10   Based on its findings of fact and conclusions of law, the court concludes that Porco is

11   entitled to have judgment entered in his favor.  Porco may file a motion for attorneys' fees in

12   accordance with the Local Rules.

14   DATED: January 19, 2010

_____

MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE